The **FIRST AMENDMENT COALITION,** **Frederick J. Huysman and Daniel R. Biddle**

v.

**JUDICIAL INQUIRY AND REVIEW BOARD.**

**Civ. A. No. 83–0579.**

United States District Court, E.D. Pennsylvania.

Feb. 1, 1984.

As Amended Feb. 22, 1984.

Samuel E. Klein, Philadelphia, Pa., for plaintiffs.

Perry S. Bechtle, Philadelphia, Pa., for defendant.

## OPINION

**LOUIS H. POLLAK, District Judge.**

This litigation presents challenges, based on the First and Fourteenth Amendments of the Constitution, to certain requirements of confidentiality which govern proceedings of the defendant, the Judicial Inquiry and Review Board of Pennsylvania—requirements mandated by the Constitution of Pennsylvania.

### I. *The Background of This Litigation*

In 1968, as part of a general overhaul of the Pennsylvania Constitution, article V— the judiciary article—was extensively revised. Section 18 of the revised article V provided for the creation of a new constitutional entity, the Judicial Inquiry and Review Board. Pursuant to implementing legislation, the Board was established and its nine members appointed—five judges by the Pennsylvania Supreme Court, and four lawyers and laypersons by the Governor— in 1969.

The constitutional mandate of the Board is to receive and inquire into complaints of misfeasance by Pennsylvania state judges and, in any instance in which the Board finds a judge guilty of some significant misconduct, to recommend to the Pennsylvania Supreme Court the judge's "suspension, removal, discipline or compulsory retirement."[1] The Pennsylvania Supreme Court is given authority by article V to "review the record of the board's proceedings on the law and facts," to "permit the introduction of additional evidence," and to "order suspension, removal, discipline or compulsory retirement, or [to] wholly reject the recommendation, as it finds just and proper."[2] Article V directs that "[a]ll papers filed with and proceedings before the board shall be confidential but upon being filed by the board in the Supreme Court, the record shall lose its confidential character."[3] Article V also recites that the joint authority of the Board and the Supreme Court to deal with judicial misfeasance "is in addition to and not in substitution for the provisions for impeachment for misbehavior in office contained in article six"[4]—the article of the Pennsylvania Constitution which preserves the time-honored authority of the legislature to remove not only judges but also executive and legislative officials who betray their public trust.

From its establishment in 1969 up to June 1, 1983, the Judicial Inquiry and Review Board has received 3040 complaints— the annual filings rising from 44 in 1969 and 67 in 1970 to 168 in the first five months of 1983.[5] The initial burden of processing these filings has fallen on Richard E. McDevitt, Esq., Executive Director of the Board, and his modest staff.[6] Mr. McDevitt dismisses a large proportion of the complaints outright either because they entirely fail to allege facts constituting misconduct or because they challenge rulings which were made by judges in the course of litigation and which are, therefore, subject to judicial oversight by appellate courts.[7]

---

1. Pa. Const., art. V, § 18(g).

2. Pa. Const., art. V, § 18(h).

3. *Ibid.*

4. Pa. Const., art. V, § 18(n).

5. Defendant's Motion to Amend Answer, Exhibit A, p. 1.

6. Mr. McDevitt's staff consists of three lawyers, one of whom is part-time, two investigators and three secretaries. Mr. McDevitt was appointed Executive Director when the Board was established.

7. The authority of an appellate court to monitor litigation-related judicial conduct in a lower court is illustrated by the Superior Court's recent decision in *Municipal Publications v. Judge Bernard Snyder*, ___ Pa.Super. ___, 469 A.2d 1084 (1983).

The Judicial Inquiry and Review Board is not an appellate court. Indeed, it is not a "court" at

Complaints which are not manifestly frivolous or outside the Board's jurisdiction are investigated informally by a staff lawyer or investigator or, on occasion, by a Board member. Frequently that informal investigation leads Mr. McDevitt to conclude that the complaint is groundless and may be dismissed without any necessity of notifying the judge that a complaint has been filed; whereupon Mr. McDevitt so recommends to the Board. If the informal investigation fails to resolve the matter, the judge is advised of the pending complaint and invited to comment. The judge's response may lead Mr. McDevitt, and then the Board, to conclude that dismissal of the complaint is proper. On occasion, the judge's response may lead Mr. McDevitt and the Board to the conclusion that, while formal sanctions are not called for, dismissal of the complaint should be accompanied by some expression of Board disapproval of the challenged conduct. Usually, the Board's disapproval is communicated to the judge in a letter of admonition which the judge signs and returns;[8] less often, the judge is summoned to a conference with a Board member—generally the Chairman—and Mr. McDevitt.[9]

Very occasionally, the Board's informal investigation and the judge's comments are insufficient to ground a Board determination either to dismiss the charges or, in the alternative, to proceed to the phase of formal accusation. In those rare instances the Board can, pursuant to a 1975 enlargement of its investigative powers, conduct a formal investigative hearing at which the attendance of witnesses and the production of documents can be compelled.[10]

If the Board's investigation—whether formal or informal—does not result in dismissal of a complaint, the Board prepares and transmits to the judge formal charges of misconduct. The Board then schedules an adversary hearing conducted by three or more Board members.[11] The accused judge is entitled to be represented by counsel. The Board's charges are not presented by Mr. McDevitt or one of his staff but by specially retained counsel.[12]

Out of the 3040 complaints filed with the Board in its fourteen-year history, only eighty-four—not quite three percent—have resulted in a Board decision to prefer formal charges.[13] Five of these eighty-four

all as that word is used in the Constitution and laws of Pennsylvania. *First Amendment Coalition v. Judicial Inquiry and Review Board,* 501 Pa. 129, 460 A.2d 722, 724 (1983).

8. The Board has issued 181 letters of admonition as of June 1, 1983. Defendant's Exhibit A, *supra* note 5, at p. 3.

9. Such conferences average about three per year; when the judge resides in a remote county, the conference may be conducted by a Board member (usually a judge) whose office is in that part of the state. *Deposition of Richard McDevitt, Esq.,* May 27, 1983, *supra* note 9, at pp. 28–9.

10. Rules 1(b) and (c) of Board's Rules of Procedure, as amended June 30, 1975. The Supreme Court prescribes the Board's Rules. Pa. Const., art. V, § 18(j). The authority to conduct a formal investigative hearing has only been exercised two or three times. *McDevitt Deposition, supra* note 9, at pp. 16, 35.

11. At least one member of the hearing panel is a judge. Board Rule 5(d). A Board member who sits on a formal investigative panel may not sit on a hearing panel. Rule 1(c).

12. Generally the Board's counsel is not compensated because the Board's budget is usually not sufficient to pay a fee to special counsel. Richard A. Sprague, Esq. served *pro bono* as Board counsel in the extended Board hearings which precipitated this litigation. Another attorney who has served *pro bono* as Board counsel in Board hearings is Perry S. Bechtle, Esq., who has rendered further public service by representing the Board in this litigation and in the Commonwealth Court litigation discussed in part III of this opinion.

13. Defendant's Exhibit A, *supra* note 5, at p. 2. To the eighty-four there should be added at least six additional cases in each of which the Board apparently would have pressed formal charges had not the accused judge, notified by Mr. McDevitt of what was in store, followed his advice that resignation would be the prudent course. In his deposition Mr. McDevitt described the process as follows (*McDevitt Deposition, supra* note 9 at pp. 24–5):
A. I don't know whether you want to call it discipline, but over the years I have gone to a number of judges and said, look, you know, we are going to have to have a hearing in your situation, have you given any consideration to resigning or retiring.

proceedings were, as of June 1, 1983, still pending. Of the seventy-nine completed proceedings, seventeen were terminated without a hearing—mooted by the judge's death, or by the expiration of the judge's term, or, most frequently, by the judge's resignation.[14] The Board has held hearings in sixty-two cases. But of these sixty-two cases, only fifty-three have been decided by the Board on the merits; nine of the sixty-two were mooted, prior to Board disposition, by resignation, retirement, or expiration of the judge's term.

Of the fifty-three cases decided on the merits up to June 1, 1983, forty-one were cases in which the Board found misconduct and filed a transcript of the Board proceedings, together with the Board's recommendation for sanctions, in the Supreme Court. By virtue of article V, section 18(h), of the Pennsylvania Constitution, the filing of the Board transcript and recommendations opened them to public view. In four of those forty-one cases, the Supreme Court rejected the Board's conclusions and dismissed the charges.

Of the twelve other cases decided by the Board on the merits, five were dismissals which the Board filed in the Supreme Court, thereby making the records public;[15] six were dismissals the Board did not file in the Supreme Court;[16] and the last was the case which gave rise to this litigation.

## II. *The Litigation Before This Court*

The case which gave rise to this litigation was initiated by a complaint against a sitting judge filed with the Board in 1980. In 1981 the Board commenced a formal investigation which resulted in a decision to prefer formal charges. In the late spring of 1982, a hearing panel of the Board began to hear testimony on the charges.

On May 25, 1982, Daniel R. Biddle—a reporter for *The Philadelphia Inquirer* and one of the two individual plaintiffs in this lawsuit—was served with a Board subpoena requiring his appearance as a witness at the hearing. Two days later, on May 27, 1982, a similar subpoena was served on a reporter for *The Pittsburgh Post-Gazette*, Frederick J. Huysman, the other individual plaintiff in this lawsuit. The subpoenas advised Messrs. Biddle and Huysman that "[b]y direction of the Constitution of Pennsylvania these proceedings are confidential and any disclosures outside the proceedings shall constitute contempt and be actionable." On May 28, 1982, at

---

Q. On how many occasions has that occurred, sir?
A. At least a half dozen.
Q. And in those situations, has the judge or justice resigned?
A. Yes.
Q. In each case?
A. Yes.
Q. Was the fact of your request for a resignation made public—
A. No, sir.

**14.** As to resignation, *cf.* note 13, *supra.*

**15.** Three of these five cases involved district justices in Erie County charged with imposing court costs on prevailing defendants. Over the dissent of one Board member, who voted for three-month suspensions, the Board dismissed the charges but directed that an administrative warning be sent to all district justices in the county. When one of the three justices was killed "trying to prevent a hold-up," the Board decided to file the joint record in the Supreme Court, and thereby make it public, "in the interest of protecting [Justice Hogan's] memory." *McDevitt Deposition,* p. 47.

The two other cases were two discrete charges against the same judge. The Board voted to dismiss one charge, and then divided five-to-four in sustaining the second charge, after which one member of the majority changed his mind, resulting in a dismissal of the second charge as well.

**16.** (1) Board found that district justice had failed to file transcripts in timely fashion, but was satisfied pattern would not be repeated. (2) Board dismissed charge that district justice ran collection business when satisfied justice was not currently engaged in that activity. (3) Finding charge not satisfactorily proved, Board dismissed, with admonition, charge of poor recordkeeping by district justice. (4) Board dismissed charge of undue delegation to staff when district justice undertook to mend ways. (5) Board dismissed charge that district justice had another job when satisfied that other job had been discontinued. (6) Board dismissed charge of administrative improprieties when satisfied district justice would reform his administrative methods thereafter.

the meeting of the hearing panel to which Mr. Biddle had been summoned, Samuel E. Klein, Esq., Mr. Biddle's counsel, sought to clarify the confidentiality requirements embodied in the subpoena. Judge Charles Mirarchi, as Chairman of the hearing panel, acquiesced in the accuracy of Mr. Klein's formulation of what he understood to be the Board's position—namely, "that Mr. Biddle is precluded from disclosing in any way his own testimony or appearance before this Board." [17] After the Board denied Mr. Biddle's motion to quash the subpoena and the Pennsylvania Supreme Court denied an expedited hearing of an appeal filed by Mr. Biddle from the Board's denial of the motion to quash,[18] Mr. Biddle testified before the Board, as did Mr. Huysman.

The Board's proceedings continued on through 1982 and into 1983.

On February 3, 1983, the present lawsuit was initiated in this court by Messrs. Biddle and Huysman and by the First Amendment Coalition—a Pennsylvania non-profit corporation comprised of some seventy newspapers,[19] associations of journalists and publishers, and television stations. The complaint alleged that the defendant Board had preferred formal charges against a sitting judge and was holding hearings on those charges. The complaint further alleged that the hearings were being conducted behind closed doors, pursuant to article V, section 18(h) of the Pennsylvania Constitution, and that plaintiffs

Biddle and Huysman had been subpoenaed as witnesses and enjoined to maintain silence under penalty of contempt. The complaint also recited that:

> A record is filed with the Supreme Court, and the seal of confidentiality is lifted, only if the Board makes a recommendation to the Supreme Court for the imposition of discipline.

The complaint further stated that the subject of the charges pending before the Board was Honorable Rolf Larsen, an Associate Justice of the Pennsylvania Supreme Court. The complaint sought (1) a declaration that article V, section 18(h), of the Pennsylvania Constitution, and its implementing statute and rules, are incompatible with the United States Constitution, and (2) an injunction against their continued enforcement.[20]

The Board's answer, filed on March 18, noted that, pursuant to article V, section 18(h), the Board was precluded from responding to the complaint's allegations about a then allegedly pending proceeding. However, the answer denied the allegation that "A record is filed with the Supreme Court, and the seal of confidentiality is lifted, only if the Board makes a recommendation to the Supreme Court for the imposition of discipline." According to the Board:

> In practice, a record is filed by defendant with the Supreme Court after a hearing

---

**17.** *Plaintiffs' response to Memorandum of the Judicial Inquiry and Review Board in Opposition to the Plaintiffs' Motion for Summary Judgment,* Exhibit A. In reply to Mr. Klein's request for some amplification of the scope of and necessity for Mr. Biddle's testimony, Marvin Comisky, Esq., counsel for the accused judge, stated, *inter alia,* that "I take the reporter's examination to be hostile...." *Ibid.*

**18.** *Judicial Inquiry and Review Board v. Justice Rolf Larsen, Daniel R. Biddle, Appellant,* Pa.S. Ct., No. 99, E.D., Judicial Inquiry and Review Board Docket (June 8, 1982). Justice (now Chief Justice) Nix dissented. This action has since been dismissed as moot.

**19.** Including, the *Inquirer* and the *Post-Gazette,* the newspapers for which, respectively, Mr. Biddle and Mr. Huysman work.

**20.** On June 16, 1982, shortly after the Pennsylvania Supreme Court's denial of Mr. Biddle's petition for expedited review of the Board's denial of his motion to quash the subpoena, Messrs. Biddle and Huysman and the First Amendment Coalition had initiated a similar declaratory judgment action in the Philadelphia Court of Common Pleas, *First Amendment Coalition v. Judicial Review Board,* C.P.Phila.Cty., No. 1435, June Term, 1982, simultaneously asking the Supreme Court to exercise its plenary jurisdiction. Pa.S.Ct., No. 62, E.D.Misc.Dkt. 1982. The Supreme Court denied the plenary jurisdiction petition on June 26, 1982. The underlying Common Pleas action was terminated on February 25, 1983.

is conducted, whether or not the Board recommends the imposition of discipline.

Thereafter discovery was had, culminating in the deposition, on May 27, 1983, of Board Executive Director McDevitt. At his deposition, Mr. McDevitt testified that the Board had recently determined, pursuant to a legal opinion prepared at Board request by special counsel Perry S. Bechtle, Esq., that article V, section 18(h) of the Pennsylvania Constitution precludes the filing with the Supreme Court of any record of Board proceedings when the Board votes dismissal of charges, since such a filing would make the Board proceedings a matter of public record.[21]

On the same day, the Pennsylvania Supreme Court filed an opinion disposing of a state court proceeding captioned, as this one is, *First Amendment Coalition v. Judicial Inquiry and Review Board.* The state court proceeding, a mandamus action reported at 501 Pa. 129, 460 A.2d 722 (1983), is closely comparable with this one in that it sought to compel the Board to file in the Pennsylvania Supreme Court, and hence to make public, "the record of its investigation of charges against a member of the judiciary of this Commonwealth." Unlike this proceeding, the one brought in the Supreme Court posed no federal constitutional challenge to article V, section 18(h) of the Pennsylvania Constitution. In dismissing the application for mandamus, the Supreme Court, speaking through Justice Zappala, said, in pertinent part:

> Petitioners, the First Amendment Coalition and Coalition members, the Philadelphia Inquirer and the Pittsburgh Post-Gazette, request that this Court issue a writ of mandamus compelling Respondent Judicial Inquiry and Review Board to file with this Court as a public document the record of its investigation of charges against a member of the judiciary of this Commonwealth. As the Board, a constitutionally independent body, has made no recommendation to this Court of suspension, removal, discipline, or compulsory retirement in this matter, this Court is prohibited by Article V, section 18 of the Pennsylvania Constitution from granting Petitioners' request. Accordingly, the petition is denied.

The present action was brought on Friday, May 6, 1983. On Wednesday, May 11, the Board filed a motion to dismiss the petition on the ground that there is no constitutional basis for the filing of the record in a case where the Board has made no recommendation of action, and on the further ground that Petitioner Philadelphia Inquirer had, on Sunday, May 8, 1983, stated in an editorial that it had obtained a full transcript of the proceedings and had begun to publish extensive verbatim excerpts of the transcript. In their answer to the motion to dismiss, Petitioners acknowledged the publication of portions of the transcript by Petitioner Philadelphia Inquirer and the Philadelphia Daily News, another member of Petitioner First Amendment Coalition, but alleged that the transcript was not available to the public or to the other members of the First Amendment Coalition. According to Petitioners, "[o]ther members of the Coalition may, if the transcripts were available, publish them verbatim. Others reviewing the transcripts may find that portions unpublished to date are worthy of public notice."

---

**21.** *McDevitt Deposition, supra* note 9, at 50–51. At the Board's request, Mr. McDevitt had asked his official counterparts in New York and California about the practices pursued by the boards of judicial inquiry and review in those jurisdictions; each advised Mr. McDevitt that his board would not make any public filing of a record of a board dismissal of charges.

In May of 1983, prior to Mr. McDevitt's deposition, the *Inquirer* published what purported to be verbatim excerpts from transcripts of Board hearings on charges against Justice Larsen. The *Inquirer* also reported that "On May 5, the board formally dismissed those charges. It also decided to keep secret all transcripts of the hearing testimony." *Phila. Inquirer,* May 17, 1983, p. 14–A, col. 1. According to the *Inquirer,* the Board's vote to dismiss was 6 to 3 and to seal the records was 5 to 3, the Board's five judge-members all being in the majority on both votes. *Id.* at cols. 1–2.

The Judicial Inquiry and Review Board was created in 1968 with the adoption by the citizens of this Commonwealth of present Article V, section 18 of the Pennsylvania Constitution. Pursuant to subsection (a) of section 18, the Board consists of nine members: three judges from different judicial districts of the court of common pleas and two judges of the Superior Court who are appointed by the Supreme Court; and two lawyer and two non-lawyer members, who are appointed by the Governor. Pursuant to subsection (b), the members serve for a single term of four years and elect a chairman annually. Members may be removed by their respective appointing authorities only for cause.

Subsection (e) directs the Board to receive complaints and reports, formal or informal, pertaining to matters relating to the suspension, removal, discipline, or compulsory retirement of justices or judges, and to make such preliminary investigations as the Board deems necessary. Should the Board determine that the complaint or report warrants further investigation, it may order a hearing pursuant to subsection (f), after which, if it "finds good cause therefore," the Board is directed by subsection (g) to "recommend to the Supreme Court the suspension, removal, discipline or compulsory retirement of the justice or judge."

Pursuant to subsection (h), upon receipt of such a recommendation, the Supreme Court "shall review the record of the board's proceedings on the law and facts and may permit the introduction of additional evidence. It shall order suspension, removal, discipline, or compulsory retirement, or wholly reject the recommendation, as it finds just and proper .... All papers filed with and proceedings before the board shall be confidential but upon being filed by the board in the Supreme Court, the record shall lose its confidential character."

From the foregoing provisions, it is clear that the Judicial Inquiry and Review Board was created to act as a constitutionally independent body. This Court is authorized to appoint some of the Board's members and to remove those same appointees for cause, but unless and until the Board "recommend[s] the suspension, removal, discipline or compulsory retirement of [a] justice or judge," the Board's decisions are constitutionally its own, and may not be disturbed by this Court, whether the decision be to regard a complaint as unfounded, to conduct a preliminary investigation, to hold a hearing, or, following the hearing, to make no recommendation of action to this Court.

The authority conferred upon this Court by subsection (h) to "order suspension, removal, discipline or compulsory retirement, or wholly reject the recommendation" is the only dispositional authority granted to this Court by Article V, section 18 of the Pennsylvania Constitution, and is of course dependent upon the existence of a Board recommendation of action in the first place. If, as in the present matter, a majority of the Board determines that suspension, removal, discipline or compulsory retirement is not warranted, there is no recommendation of action for the Board to make and thus no constitutional authority for this Court to review the record and act. The matter is constitutionally closed. Absent a Board recommendation of action, an order such as that sought by Petitioners, directing the Board to file the record of its proceedings with this Court, would clearly be violative of the constitutional division of authority between the Supreme Court and the independent Judicial Inquiry and Review Board.[22]

---

**22.** Justices Larsen and McDermott did not participate. Justice Hutchinson filed a concurring opinion. Justice (now Chief Justice) Nix voted to grant the motion for expedited consideration and to deny the motion to dismiss the petition. Cf. *In the Matter of Petition of the Pennsylvania*

*Bar Association and Frank B. Boyle,* 501 Pa. 127, 460 A.2d 721 (1983).

The press reports referred to by Justice Zappala, had, in addition to publishing purported excerpts of Board proceedings involving charges against Justice Larsen, stated that the Board had

Subsequent to Mr. McDevitt's deposition testimony of May 27, 1983, the Board moved to amend the answer filed in March in this court. The motion to amend noted that (1) the Board's answer had recited that it was Board practice to file a record of formal Board proceedings in the Supreme Court "whether or not a recommendation of discipline is made by the Board;" (2) the recital of Board practice was "accurate as of the date of the filing of the Answer;" (3) thereafter the Board had determined, on advice of counsel, that it was without constitutional authority to file a record of Board proceedings in the Supreme Court unless the Board was recommending that the court impose sanctions; and (4) "At the time of the original Answer, [the issues in the case] related to the constitutionality of temporary confidentiality, while a proceeding is pending before the Board. The issues now relate to the constitutionality of permanent confidentiality when the Board decides not to recommend discipline."

This court granted the Board's motion to amend its answer. And this court denied a motion to intervene filed by Robert B. Surrick, Esq., a lawyer who is a member of the Board. Mr. Surrick's motion asserted that he believes to be "improper," and "in violation of the First Amendment," the new policy of not filing in the Supreme Court the records of Board proceedings in which the Board votes to dismiss charges. The denial of the motion to intervene was predicated on Mr. Surrick's lack of standing.

Now before this court are cross-motions for summary judgment.

### III.

In conjunction with responding to plaintiffs' motion for summary judgment and pressing its own cross-motion, the Board has urged that both the motion and the cross-motion need not be—indeed, should not be—determined on the merits. The proper disposition of the case—so the Board has urged—is dismissal of the com-plaint in conformity with the principle of abstention announced in *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). The Board has pointed to a case filed in the Pennsylvania Commonwealth Court raising the question whether the Board should be compelled to surrender to another state agency a transcript of the very Board proceedings lack of access to which has been the catalyst of this federal case. The Board contends that the question of the availability of the transcript may be resolved in the state courts on state law grounds, in a way which would moot this federal constitutional challenge to the Pennsylvania Constitution's mandate of confidentiality of Board proceedings.

The state court proceeding whose pendency the Board perceives as obviating disposition on the merits of this federal lawsuit had its inception in a subpoena served by the Pennsylvania Crime Commission on Richard McDevitt, as Executive Director of the Board, on June 18, 1983. The Crime Commission is a statutory body charged by the legislature with the duty to conduct "inquiries into organized crime ... and ... public corruption...." [23] The Crime Commission's subpoena sought production of "the entire record of all proceedings including, but not limited to, testimonial transcripts and documents of the Judicial Inquiry and Review Board's investigation and hearings in the matter of Justice Rolf Larsen." When Mr. McDevitt declined to comply with the subpoena, the Crime Commission petitioned the Commonwealth Court for an order of enforcement; and the Board moved to quash the subpoena. The Board challenged the subpoena both as being out of conformity with state procedural requirements and as being incapable of enforcement by virtue of the mandate of confidentiality imposed on the Board by article V, section 18(h) of the Pennsylvania Constitution. The Crime Commission joined issue with the Board. But, in so doing, the

---

voted not to recommend discipline and not to file a transcript of its proceedings in the Supreme Court. See note 21, *supra*.

**23.** Pa.Stat.Ann. tit. 71, § 1190.4(1), (2) (Purdon Supp.1982).

Crime Commission did not argue to the Commonwealth Court, as plaintiffs have argued here, that article V, section 18(h), of the Pennsylvania Constitution transgresses a federal constitutional guarantee.

On December 28, 1983, the Commonwealth Court, speaking through President Judge Crumlish, dismissed the Crime Commission's petition for enforcement and granted the Board's motion to quash. Judge Crumlish held that the investigative authority conferred on the Crime Commission by the legislature could not prevail against the injunction of confidentiality with respect to Board proceedings imposed by the Pennsylvania Constitution. In rejecting the Crime Commission's contention that "nothing in the Pennsylvania Constitution ... requires the ... Board to keep its records of proceedings confidential in cases where the Board does not make a recommendation for disciplinary action," *Brief of the Pennsylvania Crime Commission,* p. 5, Judge Crumlish found controlling the Pennsylvania Supreme Court's decision in *First Amendment Coalition v. Judicial Inquiry and Review Board,* reinforced by its companion decision in *In the Matter of Petition of the Pennsylvania Bar Association and Frank B. Boyle,* 501 Pa. 127, 460 A.2d 721 (1983),[24] that the Board is, under the Pennsylvania Constitution, wholly independent of Pennsylvania's courts except when the Board makes a finding of judicial misconduct and recommends that the Supreme Court impose sanctions. Since the Board had made no such finding and recommendation with respect to Justice Larsen, and had decided not to file in the Supreme Court a transcript of the hearings it conducted on the charges against the Justice, Judge Crumlish concluded that the question of release of the transcript was, as Justice Zappala had held for the Supreme Court, "constitutionally closed."[25] Judge Crumlish was, however, at pains to point out that the Crime Commission is free to conduct its own independent inquiry into matters canvassed by the Board which come within the Crime Commission's statutory purview. And Judge Crumlish added:

> Charges of manifest misbehavior by a member of the judiciary, particularly a Justice of the Supreme Judicial Authority in this Commonwealth, would seem to cry out for open and full disclosure. By voluntary or mandatory means, the public should be privy to the facts, for only then can it have confidence in the quality of judicial performance. Indeed, if the Judiciary is to command the respect of its citizens, it must be forthright in establishing its own self-respect....

> In granting the Board's motion to quash the subpoena, we are obliged to concede with regret that the cloud of suspicion will hover over us all. This is a tragic episode in an otherwise distinguished history of the Pennsylvania Judiciary, and an inescapable reflection on those who have earnestly sought to serve with dignity and integrity.[26]

■ Whether the Crime Commission will appeal Judge Crumlish's decision remains to be seen.[27] If such an appeal is taken,

---

**24.** Dismissing an application by the Pennsylvania Bar Association and its President calling on the Supreme Court to review the Board proceedings relating to Justice Larsen.

**25.** *In re Subpoena Served by the Pennsylvania Crime Commission,* No. 1672 C.D. (Com.Ct. Dec. 28, 1983), pp. 13, 30, quoting from *First Amendment Coalition v. Judicial Inquiry and Review Board,* 501 Pa. 129, 460 A.2d 722, 724. Judge Crumlish also rejected the Crime Commission's submission that the investigation of Justice Larsen was not constitutionally privileged because it was conducted by a special counsel (Richard A. Sprague, Esq.) appointed not by the Board but by the then Chief Justice of Pennsylvania, Honorable Henry X. O'Brien; Judge Crumlish concluded that, whatever Mr. Sprague and Chief Justice O'Brien may have supposed, Mr. Sprague's appointment flowed from the Board, since "[a]ny attempt by a Chief Justice to initiate an independent investigation of a fellow Justice violates the constitutionally-ordained prerogative of the Judicial Inquiry and Review Board." *In re Subpoena Served by the Pennsylvania Crime Commission, supra,* at pp. 25–6.

**26.** *Id.* at pp. 29–30.

**27.** On the day Judge Crumlish's opinion was filed, a Crime Commission spokesperson stated that "there is a good possibility that we will appeal." *Phila. Inquirer,* Dec. 27, 1983, p. 4–A, col. 2.

and if there were good reason to suppose that it would succeed and would, on state law grounds, yield essentially the same relief plaintiffs seek in this court, *Pullman* would be strong authority that this court should stay its hand. "Avoidance of constitutional adjudications where not absolutely necessary is part of the [*Pullman*] wisdom...." *Chicago v. Fieldcrest Dairies*, 316 U.S. 168, 173, 62 S.Ct. 986, 988, 86 L.Ed. 1355 (1942); *see also Reetz v. Bozanich*, 397 U.S. 82, 86–87, 90 S.Ct. 788, 790, 25 L.Ed.2d 68 (1970); *Askew v. Hargrave*, 401 U.S. 476, 478, 91 S.Ct. 856, 858, 28 L.Ed.2d 196 (1971). However, given that Judge Crumlish carefully looked for guidance to the principles so recently announced by Justice Zappala, there seems little basis for thinking that, in the event of an appeal, the Supreme Court would disagree with the Commonwealth Court.

Moreover, even if an appeal were to succeed, the Crime Commission's victory would be most unlikely to cover the broad ground staked out by the First Amendment Coalition's prayer for relief here. The Crime Commission has focused entirely on the Board proceedings relating to Justice Larsen. It has evinced no interest, as the First Amendment Coalition has here, in Board proceedings generally—including those not yet terminated and those not yet begun. Furthermore, the Crime Commis-

sion's stake in acquiring the full record of the Board's investigation of Justice Larsen derives from a far more limited interest than does the First Amendment Coalition's stake in gaining access to the same subject matter. Thus, nothing in the position taken by the Crime Commission before the Commonwealth Court suggests that, if it were ultimately held entitled to enforcement of its subpoena, the Crime Commission would release to the news organizations comprising the First Amendment Coalition, or to the public at large, the fruits of the subpoena. Indeed, the testimony given by Commission member Alvin B. Lewis, Jr., Esq., before Judge Crumlish yields the inference that release to the media or to the public of everything produced pursuant to subpoena would be highly unlikely.[28]

Accordingly, this is not a proper case for *Pullman* abstention.

### IV.

The Board also contends that the case should be dismissed because there is no case or controversy. Because the *Inquirer* is a member of the First Amendment Coalition, the claims of the Coalition were, in the Board's view, mooted by the *Inquirer*'s acquisition of, and subsequent publication of excerpts from, the transcript of the Board hearings relating to Justice Larsen.[29] And the Board contends that the

---

**28.** N.T., July 20, 1983, pp. 33–4:

Q. [Mr. Bechtle] If the Court should order that the Judicial Inquiry and Review Board turn over its records, the records you seek, will the Crime Commission maintain the confidentiality of those records or will all or part become public?

A. The statute requires we report publicly on every investigation as it is completed. It doesn't require we disclose all of the evidence. In fact, we disclose very little of the evidence. I can't answer the question at this point. If the documents reflect criminal misconduct, that is required....

Q. Mr. Lewis, I gather from your answer as you sit here today that you're not able to represent that the records you may receive as a result of this subpoena will remain confidential?

A. The entire records?

Q. Any or all the records.

A. Just as I answered earlier, I can report what I think the Crime Commission statute is

and what our duties are. Certainly if there is evidence of criminality, we must turn it over to the prosecuting agency. I'm sure that will be done, but I can't predict the future at this point.

**29.** Although the Board, in conformity with the mandate of confidentiality imposed by the Pennsylvania Constitution, has not in pleadings or briefs acknowledged that Justice Larsen has been the subject of Board proceedings, the Board's abstention claim (*supra*, Section III of this opinion) and its mootness claim both depend upon, and hence implicitly acknowledge the accuracy of, assertions by, respectively, the Crime Commission and the *Inquirer* that the Board has conducted an inquiry into charges against Justice Larsen. Accordingly, for the balance of this opinion, it will be taken as common ground that the Justice has been the subject of a Board hearing which, in the spring of 1983, culminated in dismissal by the Board of all charges.

claims of plaintiffs Biddle and Huysman—reporters for, respectively, the *Inquirer* and the *Post-Gazette*—fail to meet Article III standards of a litigable controversy because of the manifest improbability that any action would be taken against them by the Board for failure to observe the Board's directive that those summoned to give testimony at Board hearings make no disclosure of anything touching on such hearings.

■ That the *Inquirer* may possess part, and perhaps all, of the Board transcripts relating to Justice Larsen does not moot the case with respect to the sixty-odd other members of the First Amendment Coalition with whom, so far as appears, the *Inquirer* has not shared its riches. Moreover, although the proceedings relating to Justice Larsen were the catalyst of this case, they are not the First Amendment Coalition's sole concern. The relief requested is a declaration of the invalidity of article V, section 18(h), and its implementing statute and rules, and an injunction against their future enforcement. Assuming *arguendo* that there is some merit in the First Amendment Coalition's challenge, it would be wholly illusory to remit the Coalition to the initiation of a new lawsuit each time the Board entertains a complaint. By hypothesis, neither the members of the First Amendment Coalition nor anyone else not privy to the Board's work will be alerted to an agenda the Board insists that it is required by law to keep secret. The claims of the First Amendment Coalition are, therefore, almost the paradigm of claims which can be relied on to recur, but so fleetingly as to preclude effective judicial redress. Claims in that procedural posture —i.e., "capable of repetition, yet evading

review," *Southern Pacific Terminal Co. v. Interstate Commerce Commission,* 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911)—are not moot. *See Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 563, 100 S.Ct. 2814, 2820, 65 L.Ed.2d 973 (1980); *Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 546–47, 96 S.Ct. 2791, 2796–97, 49 L.Ed.2d 683 (1976).

The Board's position with respect to plaintiffs Biddle and Huysman is that they have not been shown to be at risk and hence entitled to protective judicial intervention. It is acknowledged that they were advised, by an endorsement on their subpoenas, that "these proceedings are confidential and any disclosure outside the proceedings shall constitute contempt and be actionable." However, the Board contends that, even if one or both of the two reporters breached the directive,[30] there is no reason to suppose that adverse consequences will be visited upon a transgressor. According to Mr. McDevitt, previous infractions have occurred but "the Board during its 14 years of existence has never seen fit to take any action against a witness even though he might have ignored the prohibition."[31]

■ That the Board has in the past—whether out of prudence or compassion or doubt of its authority—refrained from enforcing its edict may portend that in the future the Board will continue in the same path. But it does not necessarily portend this. As the Board's amended answer in this very litigation makes plain, the Board has the capacity to effect sudden and fundamental changes in constitutional policy. So, since the Board has not undertaken

---

Justice Larsen has recently initiated a lawsuit sounding in defamation against the corporations which publish the *Inquirer* and the *Post Gazette*, Messrs. Biddle and Huysman, and others. *Rolf Larsen v. Philadelphia Newspapers, Inc.,* Allegheny County Common Pleas, GD 83–19240.

**30.** Mr. McDevitt, in a letter of August 4, 1983, to Perry S. Bechtle, Esq., forwarded by Mr. Bechtle on that date to this court, stated that "the prohibition has been violated on a number of occa-

sions. In fact its [*sic* ] my recollection that Dan Biddle himself violated the legend but I would want to check to be certain." According to a news report, Mr. Biddle on June 30, 1982 "discussed his testimony [in the proceedings relating to Justice Larsen] in detail with other reporters after emerging from the hearing room ..." *Phila. Inquirer,* July 1, 1982.

**31.** Letter of August 4, 1983, from Mr. McDevitt to Perry S. Bechtle, Esq., cited *supra* n. 30.

formally to assure plaintiffs Biddle and Huysman that non-compliance with the subpoenas' minatory language will not be punished, there is no ground for concluding that these plaintiffs are not at risk. Since their contention that the Board cannot constitutionally bind them to silence cannot be said to be a frivolous one, the claims presented by Messrs. Biddle and Huysman meet Article III's requirements for a "case or controversy."

### V.

On the merits, two sets of issues are before the court: *First,* there is the claim pressed by the First Amendment Coalition that its members are constitutionally entitled to access to all Board proceedings "concerning changes that are not obviously unfounded or frivolous." Plaintiffs' Memorandum in Support of Plaintiffs' Motion for Summary Judgment, pp. 13, 28. *Second,* there is the claim of journalists Biddle and Huysman that they cannot constitutionally be prohibited from divulging their own testimony before the Board and such other information about the Board inquiry into Justice Larsen as they may have gleaned as witnesses before the Board.

### 1. *The Claims of the First Amendment Coalition*

The research efforts of the parties and of the court have not identified any reported cases squarely addressing the question whether those engaged in news-gathering have a constitutional entitlement to access to the proceedings of a board which monitors the conduct of judges. Nonetheless, in aid of their respective contentions, plaintiffs and defendant both point to recent Supreme Court decisions which, it is claimed, are by clear implication controlling.

The First Amendment Coalition places principal reliance on the line of cases, from 1976 to 1982, in which the Court has vindicated press access to judicial proceedings:

*Nebraska Press Association v. Stuart,* 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976); *Oklahoma Publishing Association v. District Court,* 430 U.S. 308, 97 S.Ct. 1045, 51 L.Ed.2d 355 (1977); *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980); *Globe Newspapers Co. v. Superior Court,* 457 U.S. 596, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982); *cf. Gannett Co. v. DePasquale,* 443 U.S. 368, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1979).

The First Amendment Coalition also draws comfort from the case closest in subject matter to this one—*Landmark Communications, Inc. v. Virginia,* 435 U.S. 829, 98 S.Ct. 1535, 56 L.Ed.2d 1 (1978). There, the Court reversed the criminal conviction and attendant $500 fine of a newspaper which published an account of a proceeding pending before the Virginia Judicial Inquiry and Review Commission.[32] The Court spoke through Chief Justice Burger. Justice Stewart filed a separate opinion, concurring in the judgment. Justices Brennan and Powell did not participate.

The Board argues that *Nebraska Press Association, Oklahoma Publishing Association, Richmond Newspapers,* and *Globe* are without application here, since they are anchored in and expressly tied to the criminal trial process, where publicness has been the byword for centuries of Anglo-American legal development. *Landmark,* the Board urges, is authority for, not against, Pennsylvania's role of confidentiality: in *Landmark,* the Chief Justice was meticulous in defining "[t]he narrow and limited question presented ... [namely] whether the First Amendment permits the criminal punishment of third persons who are strangers to the inquiry, including the news media, for divulging or publishing truthful information regarding confidential proceedings of the Judicial Inquiry and Review Commission." 435 U.S. at 837, 98

---

**32.** In Virginia, as in Pennsylvania, the record of a proceeding is confidential until lodged with the state supreme court.

S.Ct. at 1540. Further, the Chief Justice was careful to state what was not at issue:

We do not have before us any constitutional challenge to a state's power to keep the Commission's proceedings confidential or to punish participants for breach of this mandate.... Nor does Landmark argue for any constitutionally compelled right of access for the press to those proceedings. *Cf. Saxbe v. Washington Post Co.,* 417 U.S. 843 [94 S.Ct. 2811, 41 L.Ed.2d 514] ... (1979); *Pell v. Procunier,* 417 U.S. 817 [94 S.Ct. 2800, 41 L.Ed.2d 495] ... (1974).

435 U.S. at 837–838, 98 S.Ct. at 1540–41 (footnote and citations omitted).

Moreover, the Chief Justice was at pains to point out in *Landmark* that Virginia's procedures for inquiring into judicial conduct were typical of those widely prevalent throughout the country, and that confidentiality was a key element in almost every one.

At the present time it appears that 47 States, the District of Columbia, and Puerto Rico, have established by constitution, statute, or court rule, some type of judicial inquiry and disciplinary procedures. All of these jurisdictions, with the apparent exception of Puerto Rico, provide for the confidentiality of judicial disciplinary proceedings, although in most the guarantee of confidentiality extends only to the point when a formal complaint is filed with the State Supreme Court or equivalent body. Cf. ABA Project on Standards for Criminal Justice, The Function of the Trial Judge § 9.1 (App.Draft 1972).

The substantial uniformity of the existing state plans suggests that confidentiality is perceived as tending to insure the ultimate effectiveness of the judicial review commissions. First, confidentiality is thought to encourage the filing of complaints and the willing participation of relevant witnesses by providing pro-

tection against possible retaliation or recrimination. Second, at least until the time when the meritorious can be separated from the frivolous complaints, the confidentiality of the proceedings protects judges from the injury which might result from publication of unexamined and unwarranted complaints. And finally, it is argued, confidence in the judiciary as an institution is maintained by avoiding premature announcement of groundless claims of judicial misconduct or disability since it can be assumed that some frivolous complaints will be made against judicial officers who rarely can satisfy all contending litigants. See generally W. Braithwaite, Who Judges the Judges? 161–162 (1971); Buckley, The Commission on Judicial Qualifications: An Attempt to Deal with Judicial Misconduct, 3 U.San Fran.L.Rev. 244, 255–256 (1969).

In addition to advancing these general interests, the confidentiality requirement can be said to facilitate the work of the commissions in several practical respects. When removal or retirement is justified by the charges, judges are more likely to resign voluntarily or retire without the necessity of a formal proceeding if the publicity that would accompany such a proceeding can thereby be avoided. Of course, if the charges become public at an early state of the investigation, little would be lost—at least from the judge's perspective—by the commencement of formal proceedings. In the more common situation, where the alleged misconduct is not of the magnitude to warrant removal or even censure, the confidentiality of the proceedings allows the judge to be made aware of minor complaints which may appropriately be called to his attention without public notice.

435 U.S. at 834–836, 98 S.Ct. at 1539–40 (footnotes omitted).[33]

For a detailed discussion (with special reference to the requirements of confidentiality, but without any determination of the constitutionality of such requirements) of California's Commission on Judicial Performance, one of the first-established (1960), state agencies monitoring judicial conduct, see *Mosk v. Superior Court of Los Angeles County,* 25 Cal.3d 474, 159

---

**33.** Most of the boards and commissions of judicial inquiry and review whose procedures are discussed in *Landmark* were established at about the time Pennsylvania's was. For a comprehensive and thoughtful review of modes of judicial discipline, see A.L. Levin and R. Wheeler, *Judicial Discipline and Removal in the United States* (Federal Judicial Center, 1979).

The Chief Justice and the Justices joining him in *Landmark* "assumed for purposes of decision that confidentiality of Commission proceedings serves legitimate state interest[s]," 435 U.S. at 841, 98 S.Ct. at 1542, but "conclude[d] that the publication Virginia seeks to punish under its statute lies near the core of the First Amendment, and the Commonwealth's interests advanced by the imposition of criminal sanctions are insufficient to justify the actual and potential encroachments on freedom of speech and of the press which follow therefrom." 435 U.S. at 838, 98 S.Ct. at 1541. What the majority was content merely to assume was, for Justice Stewart, in his concurrence, unassailably sound constitutional doctrine:

> There could hardly be a higher governmental interest than a State's interest in the quality of its judiciary. Virginia's derivative interest in maintaining the confidentiality of the proceedings of its Judicial Inquiry and Review Commission seems equally clear .... I find nothing in the Constitution to prevent Virginia from punishing those who violate this confidentiality.... But in this case Virginia has extended its law to punish a newspaper, and that it cannot constitutionally do."

435 U.S. at 848–49, 98 S.Ct. at 1546 (citations omitted).

Echoing Justice Stewart, the Board argues that the reasons for maintaining the confidentiality of judicial inquiry and review proceedings are valid, and the Board contends that this was, inferentially, acknowledged by the *Landmark* majority. Accordingly, the Board contends that the First Amendment Coalition has no constitutional entitlement to compel access to its proceedings.

Whether the First Amendment envisages a right of press access to government information has been, over the past decade, a much-vexed question. The question was first addressed by the Supreme Court in two cases decided in 1974. These cases arose when, building on the statement in *Branzburg v. Hayes,* 408 U.S. 665, 707, 92 S.Ct. 2646, 2670, 33 L.Ed.2d 626 (1972), that "newsgathering is not without its First Amendment protections," (1) the *Washington Post* challenged a Federal Bureau of Prisons regulation providing that "Press representatives will not be permitted to interview individual inmates," and (2) three journalists challenged a very similar California restraint. In *Saxbe v. Washington Post Co.,* 417 U.S. 843, 94 S.Ct. 2811, 41 L.Ed.2d 514 (1974) and *Pell v. Procunier,* 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974), the Court rejected these challenges, reasoning that "[t]he Constitution does not ... require government to accord the press special access to information not shared by members of the public generally." *Pell,* 417 U.S. at 834, 94 S.Ct. at 2810. Justices Douglas, Brennan, Powell and Marshall dissented. Justice Powell concluded that "the interview ban impermissibly burdens First Amendment freedom[s]," *Saxbe,* 417 U.S. at 850, 94 S.Ct. at 2815, because the prison officials' reasonable security concerns had generated too sweeping a regulation: "the Bureau's prohibition of all prisoner-press interviews is not necessary to the protection of the legitimate governmental interests at stake." 417 U.S. at 870, 94 S.Ct. at 2824–25. (*Pell* also involved *inmate* challenges to the interview ban; Justice Powell joined the Court majority in rejecting those challenges, but the other dissenting Justices found that inmate First Amendment rights were unwarrantably curtailed).

Cal.Rptr. 494, 601 P.2d 1030 (1979). For an account of the trials and tribulations of the California Supreme Court which gave rise to, *inter alia,* the *Mosk* case, see *P. Stolz,* Judging Judges (1981).

After *Landmark,* Congress vested in the federal courts authority to inquire into complaints about the conduct of federal judges. Unlike state systems of judicial inquiry and review, which are alternative to impeachment (see text, *infra,* at notes 34–40), the federal system is a

mode of judicial inquiry and review which is an (but not the only) avenue leading to the impeachment process. The federal court procedures authorized by Congress contemplate confidentiality. For an authoritative explication and perceptive critique of what Congress and the federal courts have fashioned, see S. Burbank, *Procedural Rulemaking Under The Judicial Councils Reform And Judicial Conduct And Disability Act of 1980,* 131 U.Pa.L.Rev. 283 (1982).

The *Pell-Saxbe* problem was revisited four years later in *Houchins v. KQED*, 438 U.S. 1, 98 S.Ct. 2588, 57 L.Ed.2d 553 (1978). *Houchins*, like *Pell*, arose in California's huge correctional system. At issue, however, was not a formal regulation for the governance of prisons generally, but a particular discretionary decision made by the Sheriff of Alameda County as overseer of the county jail at Santa Rita. Reports of an inmate's suicide and of generally deplorable jail conditions in the Greystone wing of Santa Rita had sparked community and media requests for permission to inspect Greystone. When the requests were denied by Sheriff Houchins, station KQED and local branches of the NAACP brought suit in a federal district court to compel access. Houchins then relented to the extent of permitting guided monthly tours, for twenty-five people including reporters, of portions of the Santa Rita jail other than Greystone; cameras, tape recorders and interviews with inmates were barred. The district court, concluding that preventing access to Greystone was unjustified, directed Houchins to open up the entire jail "at reasonable times and hours," and also directed him to permit press and broadcast reporters to bring cameras and recording equipment and to interview inmates. The decree, affirmed by the court of appeals, was set aside by the Supreme Court. The vote was four-to-three, Justices Marshall and Blackmun not participating.

The Chief Justice wrote the plurality opinion, which was joined by Justices White and Rehnquist.

> Neither the First Amendment nor the Fourteenth Amendment mandates a right of access to government information or sources of information within the government's control. Under our holdings in *Pell v. Procunier, supra,* and *Saxbe v. Washington Post Co., supra,* until the political branches decree otherwise, as they are free to do, the media have no special right of access ... different from or greater than that accorded the public generally.

438 U.S. at 15–16, 98 S.Ct. at 2597. In support of this holding, the opinion invoked the celebrated dictum formulated by Justice Stewart in his lecture, *"Or Of The Press"*, 26 Hast.L.J. 631, 636 (1975):

> There is no constitutional right to have access to particular government information, or to require openness from the bureaucracy. [Citing *Pell v. Procunier.*] The public's interest in knowing about its government is protected by the guarantee of a Free Press, but the protection is indirect. The Constitution itself is neither a Freedom of Information Act nor an Official Secrets Act.

> The Constitution, in other words, establishes the contest, not its resolution. Congress may provide a resolution, at least in some instances, through carefully drawn legislation. For the rest, we must rely, as so often in our system we must, on the tug and pull of the political forces in American society.

Justice Stewart, concurring in *Houchins*, agreed with the plurality's agreement with him: "The First and Fourteenth Amendments do not guarantee the public a right of access to information generated or controlled by government, nor do they guarantee the press any basic right of access superior to that of the public generally." 438 U.S. at 16, 98 S.Ct. at 2597. But Justice Stewart's separate opinion made an additional point—namely, that the press, while not entitled to greater access than the public at large, might in particular contexts need to be able to bring cameras or recording equipment essential to doing the job of reporting but not essential for the general public. Significantly, in the course of developing this distinction, Justice Stewart acknowledged that the government's justifications for a general restraint on access, which has the incidental consequence of placing particular obstacles in the path of a reporter doing the work of the First Amendment, is open to judicial scrutiny: "[T]erms of access that are reasonably imposed on individual members of the public may, if they impede effective reporting without sufficient justification, be unreasonable as applied to journalists who are there to convey to the general public what

the visitors see." 438 U.S. at 17, 98 S.Ct. at 2598. Because, in the case at bar, the district court had, in Justice Stewart's view, fashioned a decree intruding farther than was warranted on the Sheriff's discretion, Justice Stewart voted to reverse.

Justice Stevens, joined by Justices Brennan and Powell, dissented. The dissenters found that the limits imposed by Sheriff Houchins on access to the Santa Rita jail were unwarranted. Justice Stevens explained in the following words why the Constitution imposes a substantial burden of justification on government agencies that set limits on access to information:

> In *Pell v. Procunier*, 417 U.S. at 834 [94 S.Ct. at 2810] ... the Court stated that "newsmen have no constitutional right of access to prisons or their inmates beyond that afforded the general public." But the Court has never intimated that a nondiscriminatory policy of excluding entirely both the public and the press from access to information about prison conditions would avoid constitutional scrutiny. Indeed, *Pell* itself strongly suggests the contrary.

> \*   \*   \*   \*   \*   \*

> In addition to safeguarding the right of one individual to receive what another elects to communicate, the First Amendment serves an essential societal function. Our system of self-government assumes the existence of an informed citizenry. As Madison wrote:

> > "A popular Government without popular information, or the means of acquiring it, is but a Prologue to a Farce or a Tragedy; or, perhaps both. Knowledge will forever govern ignorance: And a people who mean to be their own Governors, must arm themselves with the power which knowledge gives." 9 Writing of James Madison 103 (G. Hunt ed. 1910).

> It is not sufficient, therefore, that the channels of communication be free of governmental restraints. Without some protection for the acquisition of information about the operation of public institutions such as prisons by the public at large, the process of self-governance contemplated by the Framers would be stripped of its substance.

> For that reason information gathering is entitled to some measure of constitutional protection. See e.g., ... *Branzburg v. Hayes*, 408 U.S. 665, 681 [92 S.Ct. 2646, 2656, 33 L.Ed.2d 626]; *Pell v. Procunier*, 417 U.S. at 833 [94 S.Ct. at 2809] ... As this Court's decisions clearly indicate, however, this protection is not for the private benefit of those who might qualify as representatives of the "press" but to insure that the citizens are fully informed regarding matters of public interest and importance.

438 U.S. at 27–28, 31–32, 98 S.Ct. at 2603, 2605 (footnotes omitted).

The question of access to governmental institutions and information, presented in prison settings in *Pell, Saxbe* and *Houchins*, returned to the Court, in different garb, in *Gannett Co. v. DePasquale*, 443 U.S. 368, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1979). There the Court, dividing five-to-four, sustained the order of a New York trial judge closing his courtroom during consideration of two homicide defendants' pre-trial motions to suppress certain allegedly involuntary inculpatory statements made by the defendants to the police; the court-closure order, to which a reporter had taken exception, had been entered on defendants' motion and acquiesced in by the district attorney. Justice Stewart, speaking for the Court, concluded that (1) as a general matter the Sixth Amendment principle of public criminal trials is an entitlement of the parties, not the public; (2) even if the Sixth Amendment is broadly read as constitutionalizing the public's common law right to attend criminal trials, the Amendment is without application to pre-trial phases of the criminal process; and (3) assuming, *arguendo*, that the First Amendment confers some press and public entitlement to access to the courtroom, the trial judge had in entering the closure order appropriately weighed the rights of the press, as the public's surrogate, against the fair trial rights of the defendants. Justice

Blackmun, joined by Justices Brennan, White and Marshall, dissented: (1) the Sixth Amendment is a statement of a public right of access to criminal trials; (2) a suppression motion is effectively part of the trial; and (3) the trial judge had not adequately explored alternatives to closure that would have provided equivalent protection for the defendants.

Justice Powell's concurrence announced his adherence to the doctrinal position whose validity Justice Stewart's opinion for the Court had merely assumed—i.e. that the First Amendment does indeed vest in the press and public a right to attend trials. This constitutional right, Justice Powell made clear, is subject to limitation in order to protect a defendant's right to a fair trial and the government's need to maintain confidentiality as to the identity of informants and cognate sensitive information. Justice Powell found that in *Gannett* the trial judge had reached a proper accommodation of the competing interests.

Justice Rehnquist's concurrence was a response to Justice Powell: (1) the publicness of a criminal trial traces to the Sixth Amendment and *not* to the First Amendment; (2) the Sixth Amendment right belongs only to the defendant and the sovereign as prosecutor; (3) when the defense and the prosecution agree to close a trial, or any part thereof, the judge may order closure without assigning any justification other than the parties' agreement.

The questions left in such tenuous equilibrium in *Gannett* were canvassed again by the Court in 1980, in *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980). There, pursuant to a Virginia statute that authorized "exclu[sion of any] persons whose presence would impair the conduct of a fair trial," the trial judge, over the objection of the press, granted a defense motion to close what was to be the defendant's fourth murder trial (the first trial had resulted in a conviction which was set aside on appeal; the second and third trials resulted in mistrials). The Court, by a vote of eight-to-one, held the closure order to

have been erroneous. The sole dissenter, Justice Rehnquist, followed the line laid down in his *Gannett* concurrence: a "public trial" is a Sixth Amendment right which inheres in, and is waivable by, the parties. The plurality opinion in *Richmond Newspapers* was written by the Chief Justice and was joined by Justices White and Stevens. Addressing directly what the Court had assumed *arguendo* in *Gannett*, the Chief Justice held "that the First Amendment guarantees of speech and press, standing alone, prohibit government from summarily closing doors which had long been open to the public at the time that amendment was adopted." 448 U.S. at 576, 100 S.Ct. at 2827. The Chief Justice then determined that the trial judge, having made no findings supporting his order, had erred in closing the trial. Justice Brennan (joined by Justice Marshall), Justice Stewart, Justice White, Justice Blackmun, and Justice Stevens each filed a concurring opinion bottomed on the First Amendment. Justice Stevens undertook to show how *Richmond Newspapers* brought to resolution the doctrinal debate begun in *Saxbe* and *Pell* six years before:

> This is a watershed case. Until today the Court has accorded virtually absolute protection to the dissemination of information or ideas, but never before has it squarely held that the acquisition of newsworthy matter is entitled to any constitutional protection whatsoever....
>
> ... Today ... for the first time, the Court unequivocally holds that an arbitrary interference with access to important information is an abridgment of the freedoms of speech and of the press protected by the First Amendment.

448 U.S. at 582–583, 100 S.Ct. at 2830.

Two years after *Richmond Newspapers*, the Court in *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982), determined that a Massachusetts trial court had erred in rejecting the Boston Globe's challenge to a trial court order, entered pursuant to a Massachusetts statute, closing the trial of a defendant charged with raping three minors.

Justice Brennan wrote for the Court, joined by Justices White, Marshall, Powell and Blackmun. The five Justices did not quarrel with the proposition that the State's "first interest—safeguarding the physical and psychological well-being of a minor—is a compelling one." 102 S.Ct. at 2621. The flaw in the state procedure was that court-closure was *mandatory*, whereas "the circumstances of the particular case may affect the significance of the [state's] interest." The reasons for the First Amendment right of access were explained by Justice Brennan in the following terms:

The Court's recent decision in *Richmond Newspapers* firmly established for the first time that the press and general public have a constitutional right of access to criminal trials. Although there was no opinion of the Court in that case, seven Justices recognized that this right of access is embodied in the First Amendment, and applied to the States through the Fourteenth Amendment. *Id.,* 448 U.S., at 558–581 [100 S.Ct. at 2818–30] ... (plurality opinion); *id.,* at 584–598 [100 S.Ct. at 2831–39] ... (BRENNAN, J., concurring in the judgment); *id.,* at 598–601 [100 S.Ct. at 2839–40] ... (STEWART, J., concurring in the judgment); *id.,* at 601–604 [100 S.Ct. at 2840–42] ... (BLACKMUN, J., concurring in the judgment.)

Of course, this right of access to criminal trials is not explicitly mentioned in terms in the First Amendment. But we have long eschewed any "narrow, literal conception" of the Amendment's terms, *NAACP v. Button,* 371 U.S. 415, 430 [83 S.Ct. 328, 336, 9 L.Ed.2d 405] ... (1963), for the Framers were concerned with broad principles, and wrote against a background of shared values and practices. The First Amendment is thus broad enough to encompass those rights that, while not unambiguously enumerated in the very terms of the Amendment, are nonetheless necessary to the enjoyment of other First Amendment rights. *Richmond Newspapers, Inc. v. Virginia,* 448 U.S., at 579–580, and n. 16 [100 S.Ct. at 2828–29, and n. 16] ... (plurality opinion) (citing cases); *id.* at 587–588, and n. 4 [100 S.Ct. at 2833, and n. 4] ... (BRENNAN, J., concurring in the judgment). Underlying the First Amendment right of access to criminal trials is the common understanding that "a major purpose of that Amendment was to protect the free discussion of governmental affairs," *Mills v. Alabama,* 384 U.S. 214, 218 [86 S.Ct. 1434, 1436, 16 L.Ed.2d 484] ... (1966). By offering such protection, the First Amendment serves to ensure that the individual citizen can effectively participate in and contribute to our republican system of self-government. See *Thornhill v. v. Alabama,* 310 U.S. 88, 95 [60 S.Ct. 736, 740, 84 L.Ed. 1093] ... (1980); *Richmond Newspapers, Inc. v. Virginia,* 448 U.S., at 587–588 [100 S.Ct. at 2833] ... (BRENNAN, J., concurring in the judgment). See also *id.,* at 575 [100 S.Ct. at 2826] ... (plurality opinion) (the "expressly guaranteed freedoms" of the First Amendment "share a common core purpose of assuring freedom of communication on matters relating to the functioning of government"). Thus to the extent that the First Amendment embraces a right of access to criminal trials, it is to ensure that this constitutionally protected "discussion of governmental affairs" is an informed one.

102 S.Ct. at 2618–2619 (footnotes omitted).

Justice O'Connor concurred separately in *Globe,* stressing that she interpreted "neither *Richmond Newspapers* nor the Court's decision today to carry any implications outside the context of criminal trials." 102 S.Ct. at 2623. The Chief Justice, joined by Justice Rehnquist, dissented: "The Court acknowledges that the press and the public have prompt and full access to all of the victim's testimony. Their additional [First Amendment] interest in actually being present during the testimony is minimal." 102 S.Ct. at 2625. Justice Stevens voted to dismiss the appeal on the ground that it presented no live controversy.

The lesson of *Richmond Newspapers* and *Globe* was reaffirmed by the Court this year, in *Press-Enterprise Co. v. Superior*

*Court,* — U.S. —, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984). There, in considering the validity of a trial court order closing the court during *voir dire* and denying press access to transcripts of the closed hearing, the Chief Justice wrote for the Court that "the question we address ... focuses on First ... Amendment values and the historical background against which the Amendment was enacted." *Id.* at — n. 8, 104 S.Ct. at 824 n. 8. Concurring, Justice Stevens wrote

> The focus commanded by the First Amendment makes it appropriate to emphasize the fact that the underpinning of our holding today is not simply the interest in effective judicial administration; the First Amendment's concerns are much broader. The "common core purpose of assuring freedom of communication on matters relating to the functioning of government," *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 575 [100 S.Ct. 2814, 2826, 65 L.Ed.2d 973] (1980) (plurality opinion), that underlies the decision of cases of this kind provides protection to all members of the public "from abridgment of their rights of access to information about the operation of their government, including the Judicial Branch." *Id.,* at 584 [100 S.Ct. at 2831] (Stevens, J., concurring).

— U.S. at —, 104 S.Ct. at 828.

With the exception of Justice Stewart's opinion for the Court in *Gannett,* Justice Brennan's opinion for the Court in *Globe,* and the Chief Justice's opinion for the Court in *Press-Enterprise Co. v. Superior Court,* none of the opinions on access to government information has enlisted the support of a majority of the Justices. Nonetheless, taken in the aggregate these opinions do show that the sharp doctrinal division in *Saxbe* and *Pell* has given way to a substantial doctrinal consensus reflected in *Richmond Newspapers:* A governmental restriction on public and press access to information about matters of public con-

cern presents a First Amendment question; a restriction on public and press access can be sustained, but only to the extent that it demonstrably advances significant governmental interests.

The task to be undertaken is to apply these general principles to the question whether Pennsylvania's denial of access to proceedings of the Judicial Inquiry and Review Board works an unwarranted curtailment of press (including both newspapers and broadcasting stations) freedom.

The first area of inquiry is whether the work of the Board can be said to relate to matters of substantial public concern. Then to be considered is the extent to which the requirement of confidentiality for Board proceedings serves compelling governmental interests.

█ That the Board's responsibilities relate to matters of substantial public concern hardly requires argument. The Board is a creation of, and derives its authority from, the Pennsylvania Constitution. And the Board's constitutional independence has been ratified by Justice Zappala's opinion for the Pennsylvania Supreme Court in *First Amendment Coalition v. Judicial Inquiry and Review Board.*

But if the Board's vital and unique constitutional status is to be fully comprehended, it must be viewed in historical context. Article V of the Pennsylvania Constitution places the work of the Board on a parity with impeachment, the traditional and public process of inquiry into official malfeasance. Moreover, although article V describes the judicial inquiry and review process as "in addition to and not in substitution for ... impeachment," the former appears effectively to have replaced the latter. In the fifteen years since the establishment of the Board—a period in which the Board has received over three thousand complaints and preferred formal charges against more than eighty judges [34]—Pennsylvania's house of representatives has not

---

**34.** One of whom was removed from the bench and another of whom was mandatorily retired. Exhibit A, *supra,* note 5. For resignations while charges were pending, see note 13, *supra,* and text at note 14, *supra.*

moved to impeach a single judge.[35] But the desuetude of impeachment as an instrument for dealing with alleged judicial misconduct is not a contemporary phenomenon—it seems to have begun about a century-and-a-half ago. The Pennsylvania Constitutions of 1776 and 1790 made general provision for impeachment of all civil officers and, in addition, made specific provision for the removal of high court judges by an alternative, and presumably less stigmatic, method—a simple legislative finding of "misbehavior" (1776 Constitution) or "any reasonable cause ... not ... sufficient ground for impeachment" (1790 Constitution); the 1838 Constitution dropped this alternative.[36] Attempts to impeach or otherwise unseat judges were a pervasive form of political sport in the closing years of the eighteenth century and the early years of the nineteenth century,[37] but since then no Pennsylvania judge has been impeached.[38] Commencing in 1969, with the establishment of the Board, the people of Pennsylvania have once again had in their constitutional arsenal a mechanism, alternative to impeachment, through which they possess the means of carrying out their public responsibility to combat judicial misconduct.

"Trial on Impeachment," as Professor Charles L. Black, Jr., put it a decade ago, "is public business."[39] So too is the cognate process of judicial inquiry and review administered by the Board. As Justice Brennan has observed,

a special solicitude for the public character of judicial proceedings is evident in the Court's rulings upholding the right to report about the administration of justice. While these decisions are impelled by the classic protections afforded by the First Amendment to pure communica-

35. Testimony of Mr. McDevitt, Dec. 13, 1983.

36. Section 22 of the Pennsylvania Constitution of 1776 provided that "Every officer of state, whether judicial or executive, shall be liable to be impeached by the [unicameral] general assembly, either when in office, or after his resignation or removal for maladministration: All impeachments shall be before the president or vice-president and counsel [the Supreme Executive Council of the Commonwealth], who shall hear and determine the same." Section 23 provided that Supreme Court justices, who were appointed for seven-year terms, were "removable for misbehavior at any time by the general assembly."

The 1790 Constitution created a bicameral legislature and placed executive power in a governor, thus establishing the frame of government that continues to this day. Article IV provided for impeachment by the house of representatives and trial by the senate of all "civil officers ... for any misdemeanor in office." And article V enlarged upon the 1776 provision for an additional mode of removing judges: Section II of article V provided that Supreme Court and Common Pleas judges—all of whom were appointed to "hold their offices during good behavior"—were removable by the governor "on the address of two thirds" of each legislative chamber "for any reasonable cause, which shall not be sufficient ground of impeachment."

The 1838 Constitution jettisoned a judiciary appointed for good behavior in favor of a judiciary elected for a term of years. Article IV maintained the impeachment structure established by the 1790 Constitution. But removal "on the address" of the legislature disappeared.

The 1874 Constitution followed the 1838 model.

The 1968 Constitution made no change in the impeachment provision but did revert to eighteenth century constitutional models by establishing an alternative to impeachment of judges —namely, the judicial inquiry and review process at issue in this litigation.

37. See Mundy, *The Myth of Merit*, XIV *The Barrister* No. 3, pp. 13, 14 (Fall, 1983); G. Haskins and H. Johnson, *Foundations of Power: John Marshall, 1801–15*, 214–15 (1981). In 1804, the Republican house of representatives impeached three Federalist justices of the Pennsylvania Supreme Court. The fourth justice—a Republican—insisted that he should be tried with his breathren. The senate did not convict. *Ibid.*

38. See Mundy, *supra*, note 37 at 14.

39. There may be early stages in the investigation process in the House when confidentiality should be maintained. Public disclosure or raw evidence, not yet evaluated as to credibility or relevance, might do some harm, and can do no good. In the later stages, and certainly in the Senate trial, it seems to me that the proceedings should be just as open as those in any courtroom. With reporters present, and with members of the public coming and going in the galleries, all danger of substantial secrecy would vanish. Trial on impeachment is public business.

C. Black, *Impeachment: A Handbook* 19 (1974).

tion, they are also bottomed upon a keen appreciation of the structural interest served in opening the judicial system to public inspection. So, in upholding a privilege for reporting truthful information about judicial misconduct proceedings, *Landmark* ... emphasized that public scrutiny of the operation of a judicial disciplinary body implicates a major purpose of the First Amendment—"discussion of governmental affairs."

*Richmond Newspapers*, 448 U.S. at 592, 100 S.Ct. at 2835 (concurring opinion) (footnotes omitted).

It remains to inquire whether Pennsylvania's reasons for cloaking most Board proceedings in secrecy are compelling. Given the nature of the Board's oversight responsibilities, it seems appropriate to pursue this inquiry in the light of Professor Vincent Blasi's instructive observations about the First Amendment's role as a check on government:

> Since, under the checking value, the dissemination of information about the behavior of government officials is the paradigm First Amendment activity, policies and practices that reduce the amount and quality of information disseminated to the public should not be upheld simply because they serve the convenience, or embody traditional prerogatives, of the government. At a minimum, restrictions on press coverage of official activities should be upheld only if it can be shown that the restrictions substantially promote an important governmental objective that cannot be promoted sufficiently by alternative policies having a less restrictive impact on what interested outsiders can learn about official conduct.[40]

In addressing the confidentiality requirement, three matters should be kept in mind: *First:* As Chief Justice Burger noted in *Landmark*, in most American jurisdictions "the guarantee of confidentiality extends ... to the point when a formal complaint is filed with the State Supreme Court or equivalent body."[41] *Second:* Pennsylvania today conforms to that pattern; but, until after the filing of the answer in this case, it was the practice of the Pennsylvania Board to file with the Pennsylvania Supreme Court, and hence make public, the transcripts of proceedings in which, after notice and hearing, the Board had *dismissed* charges, as well as the transcripts of proceedings in which charges had been sustained and the Board had recommended that the Supreme Court impose sanctions. *Third:* In at least ten states in which the investigative and first-instance adjudicative responsibilities are in separate hands, confidentiality ends when the investigative agency refers charges to the adjudicative tribunal.[42]

The Court in *Landmark* noted three principal grounds relied on to support confidentiality. 435 U.S. at 835–6, 98 S.Ct. at 1539–40. The first is to protect complainants and witnesses from reprisal, thereby encouraging the presentation and full airing of complaints. The second is to protect judges, "at least until the time when the meritorious can be separated from the frivolous complaints," from being the public targets "of unexamined and unwarranted complaints." The third—closely related to the second—is protection of the judiciary as an institution from the erosion of public confidence likely to flow from an expectable number of "frivolous complaints ... against judicial officers who rarely can satisfy all contending litigants."

---

40. Blasi, *The Checking Value in First Amendment Theory*, 1977 Am. B. Foundation Research J. 521, 609–10.

41. *Landmark*, 435 U.S. at 834, 98 S.Ct. at 1539.

42. Alabama: Const.Amdt. No. 328, §§ 6.17(c), 6.18(a); Arkansas: Stat.Ann. § 22–145(f); Florida: Const., Art. V, § 12(d); Illinois: Const., Art. VI, §§ 15(c), (d), (e); Kansas: Stat.Ann. §§ 20–175, 176, Rule No. 607 of Rules of Supreme Court relating to Judicial Conduct; Michigan: Const., Art. VI, § 30(2), Rule 932.22 of Supreme Court Administrative Rules; Oklahoma: Const., 7–A § 4(a), Stat. Tit. 20 §§ 1658, 1659; Tennessee: Code Ann. § 17–5–304; Vermont: Title 12, App. I., Pt. IV.R 6; West Virginia: Rules 3, 5 of Rules of Procedures for Handling of Complaints Against Justices, Judges and Magistrates. Cf. Minnesota: Stat. §§ 490.15, 490.16(5).

The First Amendment Coalition seeks access in all instances where the "charges ... are not obviously unfounded or frivolous." Memorandum in Support of Plaintiffs' Motion for Summary Judgment, p. 13. Providing access at this stage of the process would apparently not be inconsistent with the Board's perception of what is required to protect the complainant and potential witnesses: Under the Board's practice, "[i]f, after preliminary investigation, it is felt that the complaint warrants further investigation, the judge is advised of the nature of the complaint, the name of the person making the complaint or that the investigation is being made on the Board's own motion." [43]

■ However, only a fraction of the instances in which the Board conducts "further investigation" ultimately mature as cases in which the Board prefers formal charges. Accordingly, the state interest in protecting accused judges, and the judiciary itself, from public airing of charges most of which will evaporate, seems a substantial one. For this reason, the First Amendment Coalition's insistence on access to all charges other than those which are "obviously unfounded or frivolous" is not persuasive.[44]

The fact that at least ten states terminate confidentiality between the investigative and hearing stages suggests that it is entirely possible to administer a workable judicial inquiry and review process without continuing confidentiality after the hearing has begun. But because those ten states put a lower premium on confidentiality does not mean that Pennsylvania and other states are precluded from regarding confidentiality as important at the hearing stage and up until the point at which a finding

and recommendation adverse to the accused judge have been arrived at. And the Board contends that maintaining confidentiality indeed serves significant state purposes. As the record makes plain, it is not uncommon for hearings before the Board to lead to Board dismissal of charges: to be precise, twelve of the fifty-three cases decided by the Board on the merits have been Board dismissals. In those instances, so it is argued, the state has a substantial interest in protecting individual judges, and the judiciary as a whole, from the unwarranted tarnish that would accompany the publicizing of charges which, in the event, are not proved to the Board's satisfaction.

There are two difficulties with this position: The *first* difficulty is that it seems to presuppose that the channels of communication are open only to demonstrated truths. This is not so generally, and it is especially not so in matters touching on the processes of government. *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Nor is there any general principle at work which entitles judges to total exemption from the slings and arrows which others in the public arena must live with as part of the job. As Justice Frankfurter observed four decades ago, our legal system is not strengthened by efforts "to protect the court as a mystical entity or the judges as individuals or as anointed priests set apart from the community and spared the criticism to which in a democracy other public servants are exposed." *Bridges v. California,* 314 U.S. 252, 291–92, 62 S.Ct. 190, 207–8, 86 L.Ed. 192 (1941) (dissenting opinion).

The *second* difficulty with limiting access to those cases in which the Board finds that its formal charges are sustained is

---

**43.** Letter of Jan. 17, 1984, from Perry S. Bechtle, Esq., to the court. Under the Virginia procedures considered in *Landmark,* "the name of the complainant as such is never revealed to the judge under investigation even when a complaint is filed with the Supreme Court." 435 U.S. at 835 n. 6, 98 S.Ct. at 1539 n. 6. To be sure, the notice given to the judge by the Pennsylvania Board at the investigative stage may not identify potential witnesses by name, but identification of the complainant and "the na-

ture of the complaint" must in most instances effectively suggest who would be the likely witnesses.

**44.** Apart from Puerto Rico, which has no confidentiality requirement, Tennessee appears to be the only jurisdiction which opens a charge to public scrutiny the moment a determination of non-frivolousness is made. Tenn.Code Ann. § 17–5–304.

perhaps of even greater moment. To close off scrutiny of cases in which the Board dismisses charges prevents the public from making a comprehensive assessment of the standards of judicial conduct applied by the Board and the precision and consistency with which it applies those standards. The jurisprudence of judicial behavior in Pennsylvania is fashioned by the Board when it dismisses charges as well as when it sustains charges. As the Court made plain in *Landmark*, "[t]he operation of the [Board], no less than the operation of the judicial system itself, is a matter of public interest ..." 435 U.S. at 839, 98 S.Ct. at 1541. Confirmation of this is to be found in Chief Justice Nix's "state of the judiciary" address to the legislature (*Phila. Inquirer*, Jan. 31, 1984, p. 3–D, cols. 2–3):

> ... [I]t is essential that there be a policing mechanism which not only effectively supervises the conduct of those judges but also has the confidence of the people of Pennsylvania that it can and will perform its task.

Thus, if a constitutional change is to be considered, I would offer the following suggestion ... I again emphasize that I am now expressing my personal views.

I recognize that the position of the judicial officer invites frivolous and unfounded complaints.... However, where the allegations are of sufficient magnitude that would require public censure, suspension, or removal—and preliminary investigation has established that there is substantial evidence that the offense did occur—the proceeding should then become public and the public's right to know should supersede any right of the judicial officer to confidentiality.

To recognize that there is a strong public interest in knowing the disposition of all cases in which the Board prefers formal charges is not to say that there is no cost in imposing on a public servant the trauma of public accusation on charges which ultimately are not sustained—a trauma the greater for an official who, due to the special constraints of the bench, is largely disabled from seeking public support in his own behalf. There is, manifestly, a tension between the identified public interest and the identified cost. But there is a way of minimizing that tension without compromising the access interest of the public, on the one hand, and, on the other hand, the reputation interest of the accused judge and of the judiciary taken as a whole.

The way of maximizing these twin interests is to permit access to all cases in which the Board prefers formal charges—but to defer the time of access until the Board's filing with the Supreme Court of a transcript which fully records the Board's proceedings, including the rationale of its decision to sustain or dismiss the charges. Under this procedural mode, every judge formally accused by the Board would undergo public disclosure of the charges and supporting evidence—but public disclosure of charges and evidence would be accompanied by public disclosure of disposition, so that the judge who is cleared by the Board would have vindication concurrent with the ventilation of the dismissed accusation.[45]

The resolution here arrived at will require the Board, as a matter of federal constitutional compulsion, to revert to the practice it followed until after this litigation commenced—i.e., the practice of filing with the Supreme Court the records of proceedings in which charges were dismissed as well as the records of proceed-

---

**45.** With access postponed until charges are filed with the Supreme Court, the public will forego the opportunity to monitor the Board's hearings as they are conducted; but the ultimate availability of the transcripts would seem sufficiently to compensate for this limited restraint. *Cf.* Chief Justice Burger's dissenting opinion in *Globe*, quoted in text, *supra*, at p. 44.

Assurance that all cases in which formal charges are preferred will ultimately become public will limit the utility of resignation as a graceful way by which an accused judge can avoid Board disposition of charges. See text at note 14, *supra*, and cf. *Landmark*, 435 U.S. at 835–6, 98 S.Ct. at 1539–40. Under the revised procedures contemplated by this ruling, resignation prior to the preferring of formal charges may become more common. *Cf.* note 13, *supra*.

ings in which charges were sustained. The change in practice in the spring of 1983 was arrived at by the Board as a matter of construction of the Pennsylvania Constitution. Since that construction was left undisturbed by the Pennsylvania Supreme Court, it is binding on this federal court. But the construction of the Pennsylvania Constitution on which the Board relies transgresses the First Amendment.[46]

### 2. *The Claims of Frederick J. Huysman and Daniel R. Biddle*

■ Plaintiffs Biddle and Huysman contend that they are entitled to a declaratory and injunctive decree from this court announcing their constitutional freedom to say or publish whatever they, as witnesses before a panel of the Board, have learned about the Board's inquiry into the conduct of Justice Larsen. Plaintiffs bottom their contention · on the proposition that the Board's mandate of silence on pain of contempt is a form of prior restraint. That proposition is unassailable, but it only sets the stage for inquiry.

When Messrs. Biddle and Huysman gave testimony, the Board panel was conducting an on-the-record formal hearing. The purpose of the hearing was to determine whether the Board would sustain the charges against Justice Larsen and hence recommend to the Supreme Court that sanctions be imposed. In this sense the hearing conducted by the Board may be analogized to a grand jury proceeding leading to possible indictment. Once upon a time it was generally true that grand jury witnesses were barred from disclosing matters transpiring before the grand jury, including their own testimony. But that is no longer the case. In the federal setting, Rule 6(e) of the Federal Rules of Criminal Procedure imposes an obligation of secrecy on grand jurors and all those whose official status—as government attorneys, reporters, interpreters, etc.—makes them part of ·the grand jury apparatus; but witnesses are not covered by the rule, and the rule expressly recites that "[n]o obligation of secrecy may be imposed except in accordance with this rule."[47] Pennsylvania grand jury practice is to the same effect.[48]

**46.** It is to be noted that the Board, in explaining the change in practice necessitated by its revised construction of the Pennsylvania Constitution, has not undertaken to show that the change from prior practice to present practice was predicated on state interests of so compelling a nature as to overcome the First Amendment interests found here to be dispositive.

It is also to be noted that in fact the Board has, under its prior practice, filed with the Supreme Court only some of the cases in which it has dismissed charges. The present record does not disclose a coherent pattern of differentiation between those dismissals filed and those not filed. The rationale underlying the differentiation need not be explored, however, since from now on the Board will be required to make public all cases in which formal charges were preferred after those charges have been disposed of by final Board action.

**47.** *See In re: Grand Jury Subpoena Duces Tecum, Dated December 9, 1983*, 575 F.Supp. 1219 (E.D.Pa.1983). The practice was not always thus. In *United States v. Kilpatrick*, 570 F.Supp. 505, 511 (D.Colo.1983) (advance sheet), *withdrawn from publication by order of Court of Appeals*, 570 F.Supp. 505 (10th Cir.1984) (permanent volume), *republished*, 575 F.Supp. 325, 331, Judge Winner observed:

A while back, it was the practice to make grand jury witnesses take an oath of secrecy, and this is still the rule in some state court systems. Because of public outcry, the rule was changed, and, as has been seen, this is now verboten because of the language of the rule saying, "No obligation of secrecy may be imposed on any person except in accordance with this rule." This language has been uniformly interpreted to prohibit any instruction to a witness that his testimony is secret. *In re Langswager*, (1975) D.C.Ill. 392 F.Supp. 783; *In re Grand Jury Witness Subpoenas* (1974) D.C.Fla. 370 F.Supp. 1282; *In re Alvarez* (1972) D.C.Cal. 351 F.Supp. 1089; *In re Minkoff* (1972) D.C.R.I. 349 F.Supp. 154; *In re Investigation before April 1975 Grand Jury* (1976) D.C.Cir. 531 F.2d 600; *In re Vescovo Special Grand Jury* (1979) 473 F.Supp. 1335, and many other cases.

*But cf. In re Swearingen Aviation Corporation*, 486 F.Supp. 9 (D.Md.1979), *aff'd on other grounds*, 605 F.2d 125 (4th Cir.1979).

**48.** 42 Pa.Cons.Stat.Ann. § 4549(d) (Purdon 1981); *see In re November, 1975 Special Investigating Grand Jury*, 299 Pa.Super. 539, 541–543, 445 A.2d 1260, 1261–2 (1982).

On argument, counsel for the Board acknowledged difficulty in drawing a distinction between Board witnesses and grand jury witnesses. Yet Pennsylvania has done exactly that, evidently persuaded that the confidentiality of Board proceedings is of even greater moment than the confidentiality of grand jury proceedings.[49] Manifestly, requiring a witness to keep silent is an apt way of enforcing the rule of confidentiality of Board proceedings. So the restraint imposed on Board witnesses is justified to the extent that the confidentiality rule is justified.

██ In the preceding portion of this opinion, it was held that the Board must, through filing the record with the Pennsylvania Supreme Court, make public the proceedings in every case in which formal charges are preferred, but that the Board need not do so until the Board proceedings are concluded. This means that there is a valid state interest in insisting on witness secrecy[50] up to the time the Board record is filed with the Supreme Court. To the vindication of that state interest as defined in this opinion, Board witnesses can be required, on penalty of contempt, to conform their actions. Messrs. Biddle and Huysman are not, merely because they are journalists, entitled to any federal constitutional exemption from the obligations imposed by the law on witnesses generally. See *Branzburg v. Hayes*, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972).

## CONCLUSION

This court has determined that the First Amendment, made applicable to the states by the Fourteenth Amendment, requires Pennsylvania to modify the procedures of the Board of Judicial Inquiry and Review so that the people of Pennsylvania can—as of the day the Board makes its ultimate disposition—be privy to the record of the Board's proceedings in every case of alleged judicial misconduct deemed by the Board serious enough to warrant preferring formal charges. This determination connotes no disrespect for the principle of confidentiality which informs article V, section 18(h), of the Pennsylvania Constitution and the cognate provisions of law embodied in constitutions or statutes or rules of court of almost every other American jurisdiction. This determination respects that principle by giving it scope commensurate with, but limited to, the due effectuation of its animating purposes—the ground of limitation being the due effectuation of the supreme law prescribed by the Constitution of the United States.

In requiring disclosure of the Board's proceedings and, thereby, disclosure of the underlying facts of judicial behavior and the standards by which that behavior is judged, the First Amendment is not engaged in some formalistic intrusion on the sovereignty of Pennsylvania. The First Amendment helps the Commonwealth and its people to secure the integrity of the judicial branch of their republican form of government. The First Amendment here vindicates a principle of prudence basic to our democratic institutions—a principle recently articulated by Chief Justice Burger in words which a free people may forget only at their peril: "People in an open society do not demand infallibility from their institutions, but it is difficult for them to accept what they are prohibited from observing." (*Richmond Newspapers, Inc.*

---

**49.** For purposes of this discussion it is assumed that, within wide limits, both the Pennsylvania legislature and Congress have authority to revert to the earlier practice under which grand jury witnesses could be required not to divulge their testimony; due process considerations might, however, impose certain constraints—to the extent, for example, of permitting a witness to consult freely with counsel. *Cf.* 42 Pa.Cons. Stat.Ann. § 4549(d) (Purdon 1981):

*Disclosure of proceedings by witnesses.*—No witness shall be prohibited from disclosing his testimony before the investigating grand jury except for cause shown in a hearing before the supervising judge. In no event may a witness be prevented from disclosing his testimony to his attorney.

**50.** Subject perhaps to the qualification that a Board witness should be permitted to make full disclosure of what the witness knows to counsel, *see* note 49 *supra*, and possibly subject to kindred due process qualifications.

*v. Virginia,* 448 U.S. 555, 572, 100 S.Ct. 2814, 2825, 65 L.Ed.2d 973 (1980).